IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 6:26-cr-00008 |
| | ) | |
| JESUS DIAZ, Jr. | ) | |

**SENTENCING MEMORANDUM OF JESUS DIAZ**

Jesus Diaz's life has been punctuated by abuse, chaos and trauma. Jesus has been the victim of emotional and sexual abuse, both inside and outside his home, and he has been afraid for the safety of himself and those he loved most. These events shaped the man Jesus is and set him on two parallel but vastly different tracks through life. On one hand, he is a devout catholic who has often sought answers through his faith. But Jesus has struggled with his faith both because of the traumas he has endured and that he has perpetrated. Referring to the offenses in this case, Jesus said "I am guilty of that. I feel guilt and shame about that. I have not been a good Catholic or a good Christian or a good person."[1] Jesus has found himself in his current situation because of his own poor choices. Choices that impacted the lives of many vulnerable individuals. The tragic events that

[1] Quotes from Jesus and his father come from interviews with Matthew Hancock, Mitigation Specialist with Federal Public Defender Office. Mr. Hancock will be present at sentencing and available for examination by the Court or Government if needed.

have occurred in Jesus's life do not excuse his behavior, but they do aid in putting it int context.

The sentencing guidelines range calls for a sentence of life for the offenses of the 25-year-old before the Court. Because a life sentence is far greater than necessary to meet the goals of sentencing, the plea agreement proposed by the parties and accepted by this Court calls for a range of 216 to 240 months.

A sentence of 216 months is sufficient but *not more than necessary* to achieve the purposes of 18 U.S.C. § 3553(2). 216 months is more than two thirds of Jesus's life to date. A sentence of this length reflects the seriousness of and provides just punishment for the offense and promotes respect for the law. Further, Jesus requests a sentence at the low end of his (c)(1)(C) plea for the following reasons:

1. Jesus's young age at the time of the offense conduct.

2. His childhood sexual abuse and re-victimization by his siblings and the related issues that contributed to the offense conduct.

3. His lack of any significant criminal history.

4. The remorse Jesus has expressed and shown by pleading guilty.

5. The pain caused by his mother's murder and his perception of his role in it.

6. Jesus's struggles with his mental health and bouts of substance abuse.

7. To avoid sentencing disparities with similarly situated defendants in the Western District of Virginia and elsewhere.

In total, the low end of the (C) range, *18-years*, is enough to do justice.

## OBJECTION TO REVISED PRESENTENCE REPORT

The initial PSR provided information primarily about MV1. PSR at 29. The Government's PSR objections generally requested the inclusion of additional information about MV3, MV4 and MV8 (ECF 50 at 1). The Revised Final PSR includes additional information about these minor victims. PSR at 29;The defense objects to the inclusion of the following information in ¶ 29 of the Final PSR: Jesus "began threatening MV3 that he would … hurt her family. This information does not carry sufficient indicia of reliability and should be stricken. *United States v. Powell*, 650 F.3d 388, 393-394 (4th Cir. 2011) (citations omitted); U.S.S.G. § 61.3(a) (evidence used must have a "sufficient indicia of reliability to support its probable accuracy[.]").

The allegation that Jesus threatened harm to MV3's family is inconsistent with the evidence relating to the other three charged minor victims and the information relating the other minor victims identified by law enforcement. There is no other allegation or evidence that Jesus threatened harm to any other minor victim's families. In addition, MV3 reported that individuals besides Jesus requested sexual materials from her, and there are indications of gaps in her memory of the incident. For instance, she did not remember Jesus's screen name, though she remembered other parts of the offense. PSR ¶ 29. Given that MV3's memory of the event does not appear complete or may be conflated with other individuals and threats to family members are outside of the pattern of

conduct relating to the other minor victims, this information is not sufficiently reliable and should be stricken from the PSR.

## BACKGROUND AND HISTORY

The tragedies of Jesus's life blend into each other and it is difficult to fully trace the complex relationships between his traumas. Jesus's experiences with poverty, a lack of adult supervision, molestation as a child, conflict between his mother and his father, serious emotional abuse by siblings, his mother's and his own mental health challenges, substance abuse, abandonment by his mother and his mother's murder all helped shape who he is at this point in his life. Amongst these experiences, it easy to see how the self-loathing, embarrassment and attachment issues that Jesus has developed contributed to the offense conduct. But Jesus's life is also characterized by a strong and abiding Catholic faith, love for his father, intelligence, and curiosity. These are the same traits that warrant hope for Jesus's future.

### I. Poverty and an unhappy home

Both of Jesus's parents love him. Nevertheless, that did not stop his home life from featuring serious disruption. Jesus was born in Atlanta, Georgia; the child of immigrant parents striving to make life work in America. *See* PSR at ¶ 92-93. In Atlanta, Jesus's parents owned food trucks and a restaurant. *Id*. at ¶ 93. Running a food industry business is an all-consuming line of work. To top it off, Jesus's parents had three other children besides Jesus to raise and provide for. *Id*. at ¶ 92. They had little time left over to supervise

and raise Jesus. *Id*. at ¶ 93. Instead, he spent much of his early years under the care of his neighbors in Atlanta.

Despite his parent's relentless work ethic, Jesus's early years were characterized by poverty. *Id*. He recalls that there were times when his family would go without running water or electricity. *Id*. Jesus recalled times when the family slept at the restaurant when their home was not habitable. He said, "I remember being poor and I remember being cold and I remember not having clean clothes to wear and feeling ashamed. I remember my parents fighting and wondering if all families were like this but knowing that they weren't." According to Jesus's father, Jesus Diaz-Hernandez, the family restaurant business went under following economic uncertainty after the terrorist attacks on September 11, 2001. Jesus sometimes missed school because of his family's difficult finances. *Id*. And when he was at school, he "often" felt embarrassed by his poverty – for example, because of his unwashed and dirty clothes. *Id*. At an early age, Jesus lost school as a safe harbor and source of resilience.

Jesus's mother was also mentally ill. *Id*. at ¶ 94. She struggled with bipolar disorder and had serious anger issues. *See Id*. She would sometimes become so enraged that she would physically strike Jesus. *Id*. The arguments between his parents were volcanic. *Id*. They were so toxic that Jesus's father would subsequently leave the home for days and weeks at time. *Id*. at 15. Mr. Diaz-Hernandez reported that sometimes his wife would be violent towards him and sometimes to their children with Jesus bearing the brunt.

Perhaps the most damaging, though, were her verbal assaults. Mr. Diaz-Hernandez said through an interpreter, "She would shout at me about my son, about Jesus, she would say 'our son is lazy. He'll never amount to nothing.' she would yell about him a lot. She would say he was 'gay.' It was loud and I know my son, Jesus could hear everything she said about him all the time." Mr. Diaz-Hernandez described Jesus as being his mother's favorite, and no doubt the misguided explosiveness of these arguments was driven by intense concern for Jesus. Still, Jesus learned from these arguments what his mother thought about who he was growing up to be. Jesus said,

> My parents would fight. They would scream. My mother would scream, she would say things about me, but then she'd cool down, calm down and she'd come to my room and hug me. I remember being confused. Why do you love me and then say those things about me.

In addition to disrupting Jesus's home, his mother's negative perspectives were internalized and ingrained.

## II. <u>Sexual abuse and destroyed capacity to trust</u>

When Jesus was six years old, a neighbor's child molested him. *Id*. at ¶ 95. This began during one of the nights that Jesus spent at a neighbor's house while living in Atlanta. *Id*. The molestation continued for a year. *Id*. during this prolonged period of abuse Jesus was introduced to both masturbation and pornography for the first time. Jesus felt ashamed about the abuse and did not tell his parents. Jesus said, "It was confusing. I didn't want it. He told me what to do."

Jesus's his siblings discovered that Jesus was being abused. *Id*. Instead of helping and supporting him, they mocked Jesus and called him slurs – for example, derogatorily calling him gay. Mr. Diaz-Hernandez learned that Jesus had been molested from Jesus's siblings. He observed how damaged Jesus was by their cruel taunting. Though he never talked to Jesus about what happened to him, Mr. Diaz-Hernandez tried to discourage Jesus's siblings from re-victimizing him with their mockery. Still, Jesus's siblings persisted in their invective towards him.

Being molested and then mocked for being a victim left Jesus devastated. He felt "embarrassed and isolated." *Id*. at ¶ 95. He withdrew inward. Mr. Diaz-Hernandez described it like a switch being flipped. He said that Jesus had been a happy child, but became quiet and shy instead. He was utterly terrified that his siblings would share with schoolmates that he had been molested. *Id*. To this day, Jesus has troubled relationships with his siblings; in part stemming from the way they treated him. He does not communicate with them today. *Id*. at ¶ 92. Jesus believes that his father never discussed what happened because he too was embarrassed. *Id*. at ¶ 95. Being molested had a lasting impact on Jesus in other ways as well. With his parents working, he was left to his own devices after being sexualized at such a young age and was left with free access to the internet and pornography. *Id*.

His abuse taught Jesus that he could not forge deep, trusting relationships with the people in the world. The friend who molested him betrayed him. His siblings

betrayed him. He could not talk to his own father about what happened. And school, what should be a zone of safety, became a place of deep fear. Compounding these trust issues was Jesus's own complicated mental health. Though he has never been diagnosed, Jesus believes that he, like his mother, suffers from bipolar disorder. PSR at ¶ 100. This trauma and the stress from his life has no doubt contributed to the addictive aspects of his personality. *Id*. Keeping secrets, and a world in which people would threaten to expose them, became his norm.

## III. <u>Abandonment by his mother and feeling responsible for his mother's murder</u>

Despite the dynamics of their home, Jesus's mother was an important person in his life. Ms. Cardenas left Jesus's father when Jesus was around 19 or 20 years old. Prior to leaving, Ms. Cardenas had begun an affair with Adam Hughes, the man would ultimately murder her. Ms. Cardenas and Mr. Diaz-Hernandez had a fight that was the final straw, and Ms. Cardenas left her family. Jesus felt the absence of his mother and reacted badly when his mother left his father's home to be with Hughes. Mr. Diaz-Hernandez said after Jesus's mother left, Jesus became confrontational about his father's failure to protect Jesus from his mother's angry episodes.

But Jesus's relationship with his mother was complicated, and he still wanted her in his life. After Ms. Cardenas left the home, she and Jesus stayed in contact. He would visit her at her home and sometimes at work. Jesus became aware that his mother's relationship with Mr. Hughes a was fraught with violence. He learned from Ms.

Cardenas's social workers that Mr. Hughes often brutally beat her. Jesus was incensed and demanded his mother end the relationship. She refused. Later that year, Ms. Cardenas called him and said that Mr. Hughes had been arrested after holding her and her brother captive at gunpoint for several hours. The arrest paperwork indicates that Mr. Hughes actually held a gun to Ms. Cardenas's temple and pulled the trigger but the gun misfired. Hughes Arrest paperwork, attached hereto as Exhibit 1. Jesus went to his mother's home and helped her install trail cameras around her home and yard so that if Mr. Hughes was released from jail, she could see if he was Ms. Cardenas revealed that since his arrest Mr. Hughes had been mailing her effusive love letters proclaiming his regret and begging her forgiveness. She was ignoring them.

On another visit, Jesus was playing a game on his mother's phone whena message popped up that an inmate in Henry County was trying to reach her via his tablet. Jesus knew this was Mr. Hughes. He debated deleting the message. He said, "my mom wasn't tech savvy. She never would have known, but instead he showed her." Jesus believes that after he left his mother accepted the message and began communicating with Mr. Hughes. In December of 2022, Ms. Cardenas, who spoke little English, asked him to assist her in withdrawing her statement against Mr. Hughes and pay his bail. He protested but ultimately assisted her. Mr. Hughes was released that month and moved in with Jesus's mother.

Ms. Cardenas would soon be dead at Hughes's hand. In October of 2023, she went missing for two weeks. Eventually, she was found dead, wrapped in a blanket in the woods. As would become clear at trial, Adam Hughes killed her in a slow and vicious fashion, sawed off her legs, and callously dumped her body in the woods. Hughes Sentencing Transcript, attached hereto as Exhibit 2, at 38. The discovery of Ms. Cardenas's body on November 1, 2023, would begin a long, arduous, and painful court process for Jesus and his family. Indeed, one of his siblings, Sarah Webster, explained that the two years of the case were "mentally and emotionally exhausting, as well as shocking." *Id*. at 5. Court records reflect that Hughes was arrested on November 1, 2023, and was not finally sentenced until January 17, 2025. According to Mr. Diaz-Hernandez, his family attended as many Court proceedings as they could. Jesus, however, explained in his presentence report interview that he could not stand attending the Court proceedings after hearing Hughes proclaim his innocence at a scheduling date. *See Id*. at 11 (describing Hughes's "smug demeanor and lack of emotions during the entire process."). Jesus's mother's death crushed him, and he increased his drug use as a coping mechanism. PSR at ¶ 103.

Jesus feels like he caused his own mother's death. He believes that by helping his mother and Hughes communicate in 2022, he helped keep his mother in Hughes's life. This gave him the opportunity to kill her. The reality that he is actually a blameless victim has not assuaged Jesus's warped perspective over what happened to his mother.

He said, "Yes, I felt guilty…I still feel guilty. I feel guilty for showing her the message on her phone. I should have deleted it. I feel guilty for helping her, helping her get him out…and then…he…what he did, Adam Hughes, he murdered my mom, he cut her up and hid her in the woods. Alone. She had suffering in her life, horrible suffering from her father and her struggles, her mental health…she struggled and suffered and he made her suffer again when he killed her. He took her away in a horrible way. Our relationship was difficult, but he ended it, the good and the bad parts…but to get back to it, I felt guilty about that and still do."

## IV. Growing commitment to religion and reason for optimism

Jesus has always had a strong commitment to his Catholic faith. He has been going to church his entire life. Throughout Jesus's tumultuous first seven years, and during his life as a whole, the rock of stability was the Catholic Church. For Jesus the Church was a place of safety and comfort and the family often spent free time with friends from church. The Church provided the family with a broad and welcoming social circle. Jesus said, "I always liked church and felt good there."

After receiving his first communion Jesus became an altar boy. Jesus said, "Church was magical to me. Not just the scripture but the place itself, the room and the symbolism of the different things. I wanted to be a part of it." He continued, "being an alter boy made me feel closer to god." Later, he would join the Knights of Columbus, a global Catholic fraternal organization dedicated to charity, faith, and service.

Before his incarceration, Jesus attended church at both Sacred Heart in Danville and St. Cyril and Methodius Byzantine Catholic Church in Cary, North Carolina. The Byzantine Catholic Church was a couple of hours from Jesus's home. However, the more formal and traditional nature of the Byzantine church matched Jesus's interest in a more solemn form of faith. Jesus said, "There was something about the old ways of church that appealed to me. Ceremonies. I didn't like some of the modern aspects of church. I feel like the older ways are closer to how God wants us to live and pray. I enjoy solitude. That's peace to me. I would love to live in a monastery. To pray and be away from computers and technology. I think that's best for me." Mr. Diaz-Hernandez said, "Jesus took his faith very seriously. Maybe too serious." He continued, "He was always a solemn, more serious person." Mr. Diaz-Hernandez explained that Jesus's more serious and quiet nature made it difficult to get along with peers his own age. Jesus's involvement in church allowed him to associate with older and more mature peers.

Priests from both churches have written letters on Jesus's behalf. They speak to both his commitment to his church communities and the positive influence both churches had on Jesus. Reverend Vasyl Sokolyvch wrote that "he has helped our parish in many ways, including volunteering, assisting with church activities and events, and helping other members of our community" and that he has witnessed Jesus's "willingness to help others without expecting anything in return." Letter from Reverend Vasyl Sokolovych, attached hereto as Exhibit 3. Marie Taylor, a parishioner and music teacher at St. Cryil

was impressed that Jesus traveled so far from his home to attend church there. Letter from Marie Taylor, attached hereto as Exhibit 4. Michelle Sapsara, who works in the parish office at St. Cyril, observed that Jesus's interest in the church was genuine and even extended to a desire to potentially spend time in a monastery. Letter from Michelle Sapsara, attached hereto as Exhibit 5. Father Anthony Senyah from Sacred Heart Danville saw Jesus as "a young man with considerable potential, an active faith, and a commitment to participating in our parish community." Letter from Father Anthony Senyah, attached hereto as Exhibit 6. Importantly, Father Senyah's letter also reflects his understanding from Jesus's father that Jesus has shown remorse and accepted responsibility for his actions. *Id*.

Jesus has remained committed to his faith during his incarceration. He is currently working through a prayer book provided by a friend on the outside. Continued commitment and focus on his faith and the teaching of the Catholic Church is a good use of Jesus's energies. Religion has had a positive impact on him. Even before his incarceration, Jesus reports that he had begun to confess his crimes to a priest during confession. Jesus will have many years to continue to practice and grow in his faith while incarcerated and the Catholic Church will be an important pillar for his rehabilitation once he returns to the community.

## ARGUMENT

"We measure our humanity by the justice we mete to those thought least deserving." *United States v. Helton*, 782 F.3d 148, 159 (4th Cir. 2015) (Gregory, J., concurring). After considering the calculated advisory guideline range, courts are to consider all the factors under 18 U.S.C. § 3553(a) in reaching the appropriate, individualized sentence for the particular case. *See Gall v. United States*, 552 U.S. 38, 49 (2007); *Kimbrough v. United States*, 552 U.S. 58, 90 (2007) (observing that the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence").

In addition to the advisory guideline range, the other factors that a court must consider when determining an appropriate sentence include the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with appropriate correctional treatment, *id.* at § 3553(a)(2); the kinds of sentences available, *id.* at 3553(a)(3); the need to avoid unwarranted disparity among defendants with similar records and conduct, *id.* at § 3553(a)(6); and the need to provide any restitution to any victims of the offense, *id.* at § 3553(a)(7). Pursuant to 18 U.S.C. § 3553(a), courts must "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing.

Additionally, the Supreme Court has recognized that that a sentence imposed pursuant to a Rule 11(c)(1)(C) plea agreement is generally based on the agreement and not the Guidelines. *See United States v. Williams*, 811 F.3d 621, 624 (4th Cir. 2016) (*citing Freeman v. United States*, 131 S.Ct. 2685, 2695 (2011) (Sotomayor, J., concurring)). While the Court must, of course, properly calculate the guidelines range, that the guidelines are higher than he (C) range is not enough to, alone, to warrant a high-end sentence in this case. The circumstances of this case counsel a sentence at the low-end of the guidelines range, 216 months (*i.e.*, 18 years).

**I. <u>Nature and seriousness of the offense</u>**

The offense conduct is laid out on pages ¶¶ 5-34 of the presentence report. Jesus realizes the scope and severity of these offenses and that they call for significant punishment and prison time. He has true remorse for his actions, as his guilty plea and discussions with his father and the defense show. Jesus pled guilty quickly. In addition, he has given up his right to appeal the denial of his motion to suppress by pleading guilty.

Jesus's shame and isolation from his sexual abuse and his sibling's cruel harassment is important context for his offense conduct. He was sexualized at a young age when he was molested for the first time at age 6. He then was re-victimized by siblings, including by their mockery and calling him slurs for being molested. PSR ¶ 95. He was terrified that his siblings would reveal this secret abuse at school. *Id*. This fear and embarrassment, combined with dysfunctional family dynamics, isolated him from his

peers. Isolated and ashamed, he turned to the internet, and as far back as 2019, and beginning when he himself was a minor, began engaging in the offense conduct underlying this case. As time went on, the offense conduct would also occur against the backdrop of his struggle with what he would come to believe was bipolar disorder and PTSD, his own substance abuse problems and the murder of his mother. *Id.* at ¶ 100, 102.

Multiple courts have found a defendant's childhood sexual abuse as a mitigating factor. *United States v. Anderson*, 90 F.4th 1226, 1228 (8th Cir. 2024) (district cited childhood sexual abuse as one factor among others that led to significant downward variance in production case); *United States v. Pelloski*, 31 F. Supp. 3d 952, 954-955 (S.D. Ohio 2014) (childhood sexual abuse a "significant" mitigating factor in child porn accessing case); *Janos United States v. Janosko*, 355 Fed. Appx. 892, 894 (6th Cir. 2009) (treating defendant's sexual abuse as a child as a mitigating factor when sentencing child pornography offender). What happened to Jesus when he was only *six* years old is a resoundingly important and mitigating factor.

## II. <u>Character and history of the defendant.</u>

Jesus's history is characterized by childhood and early adulthood adversity. Adverse Childhood Experiences (ACEs) are "disruptions to the promotions of safe, stable, and nurturing family relationships and are characterized by stressful or traumatic events that occur during an individual's first 18 years of life." What Are ACEs? A Guide

for Judges, American Psychiatric Association Foundation, available at https://www.apaf.org/our-programs/justice/free-resources/what-are-aces-guide-for-judges/ (last viewed October 6, 2026). Minimization of ACEs is essential to healthy child development and thriving adulthoods. *Id*. ACEs are typically reflected in a score comprised of tallies for "different types of abuse, neglect, and other hallmarks of a rough childhood" such as domestic violence, substance use, mental illness, parental separation, and incarceration. *Id.* Jesus has experienced at least one ACE in every category. *Id*. High ACE scores like his often culminate in the adoption of harmful behaviors such as drug use, mental health problems and the commission of crimes. *See Id*.[2] Indeed, Jesus has previously developed drug, alcohol and gambling addictions. PSR at ¶ 100, 102. And while it is true that many if not most of the people that come before the Court for sentencing have had troubled lives, Jesus high degree of adversity and trauma must be factored into the individualized assessment at sentencing. *United States v. Black*, 2022 U.S. App. LEXIS 11305 at 9-10 (4th Cir. 2022) (unpublished)

Crucially, research has found that protective and compensatory childhood experiences ("PACEs") can increase a youth's resilience in the face of childhood

---

[2] Zara Quigg, Mark A. Bellis and Nadia Butler et al., Adverse childhood experiences, and violence and criminal justice outcomes in adulthood—the moderating role of protective and compensatory childhood experiences, BMC Medicine (Nov. 2025), available at https://link.springer.com/article/10.1186/s12916-025-04459-3 (last viewed October 1, 2026).

adversity.[3] PACEs are factors like trusted adults, trusted friends and extracurricular activities like participation in sports. While Jesus played soccer and had a strong Catholic community as a child, he systematically lost the ability to forge close relationships with his parents, siblings and friends. His father was not present. His mother was mentally ill and prone to bouts of rage. His siblings taunted him over his sexual abuse. And he felt isolated and even afraid – of the exposure of his abuse – at school. Jesus had very few protective factors in the home in the face of such a difficult childhood.

Finally, Jesus is still a young man, and his character is still forming. Jesus began the offense conduct when he was still a minor and was in his mid-twenties when it ended. The underdeveloped decision-making and mental reasoning associated with youth are well-documented and have been explicitly recognized by the Supreme Court and the United States Sentencing Commission. In *Roper v. Simmons*, the Court explained that young people are less mature, more reckless, more susceptible to peer pressure, and have "transitory" personality traits. 543 U.S. 551, 569-70 (2005). Although *Roper* and *Miller*'s precise holdings were limited to juveniles under the age of 18, the Sentencing

[3] *See, e.g.*, Zara Quigg, Mark A. Bellis and Nadia Butler et al., Adverse childhood experiences, and violence and criminal justice outcomes in adulthood—the moderating role of protective and compensatory childhood experiences, BMC Medicine (Nov. 2025), available at https://link.springer.com/article/10.1186/s12916-025-04459-3 (last viewed October 1, 2026);

Commission has since acknowledged that reckless characteristics of youth may not subside until closer to age 25.[4]

The Fourth Circuit have also recognized the importance of youth as a mitigating factor. In *United States v. Hoffler*, the Fourth Circuit found the district court's sentence procedurally unreasonable because it "failed to consider [the defendant's] arguments regarding her age [of 24 years at the time of the offense], lack of criminal history, low risk of recidivism, and cooperation with law enforcement." *United States v. Hoffler*, No. 22-4101, 2022 U.S. App. LEXIS 35773 at 15 (4th Cir. 2022) (unpublished). Jesus's offense conduct occurred while a youth. This corresponds with a time when the throes of brain and character development are occurring.[5] Though these crimes will always be part of his makeup and history, his character is not set in stone. Instead, Jesus's guilty plea and continued devotion to his faith are signs that Jesus is grappling with his offense conduct

---

[4] *Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015*, U.S. Sent'g Comm'n, (May 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf (last viewed October 6, 2026) ("[T]here is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average.").

[5] Neurological research shows that "people may not gain full reasoning skills and abilities until they reach age 25 on average." USSC, Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf. In fact, "brain development for adolescents continues well into young adulthood, and the decision-making capacity of young adults shares much with the impulsiveness of younger teenagers." Vincent Schiraldi et al., Community-Based Responses to Justice-Involved Young Adults. New Thinking in Community Corrections Bulletin. USDOJ, NIJ (Sept. 2015), https://www.ojp.gov/pdffiles1/nij/248900.pdf.

and attempting to transform into a better person. *Smith v. Wainwright*, 664 F.2d 1194, 1196 (11th Cir. 1981) (a defendant's admission of responsibility or expression of contrition is "is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence").

## III. Specific and general deterrence

216 months is a sentence sufficient to promote respect for the law and to deter others from similar conduct. Research indicates that the probability of being caught, and not the length of the sentence, is what matters for deterrence.[6]

Additionally, Jesus will be placed on supervised release following his conviction. The Supreme Court has recognized that supervision imposes a serious restriction on a person's liberty. *Gall*, 552 U.S. at 48. Individuals on supervision are "nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.; see also United States v. Knights,* 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.") (internal citation omitted).

---

[6] See Valerie Wright, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment, The Sentencing Project (Nov. 2010) Available at: https://www.antoniocasella.eu/nume/Wright_2010.pdf (last visited February 23, 2026); Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013); United States v. Lawrence, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (citations omitted); United States v. McCarthy, 2023 U.S. Dist. LEXIS 93832 at 9 fn.1 (E.D.N.Y. May 30, 2023) ("the Court also notes that research shows the data on the effect of harsh sentences, including but not limited to incarceration, as a general deterrent is mixed at best.") (citations omitted) (unpublished).

Further, as a part of his conviction, Jesus will be required to register as a sex offender. This classification is not a trivial consequence. Even after he is released from prison, this status will follow him for at least 25 years, impacting his employment options, limiting where he can find housing, and generating severe social stigma. 34 U.S. Code § 20911. As one court emphasized: "[t]o be adjudicated guilty necessarily results in denomination as a sex offender; automatically provided is a lifetime of continuous punishment—being marked as a pariah with severe restrictions on residence, movements, activities and associations. Adding unnecessary, unduly long, periods of incarceration is inappropriate and it should be avoided." *United States v. R.V.*, 157 F.Supp.3d 207, 210 (E.D.N.Y. 2016).

**IV. The sentencing guidelines are harsher than necessary.**

Much has been written about problems with the child pornography guidelines. *See, e.g., United States v. Henderson,* 649 F.3d 955, 962-963 (9th Cir. 2011). Though the criticisms around child pornography guidelines are focused on U.S.S.G. § 2G2.2, § 2G2.1 suffers from many of the same problems. *See United States v. Price*, 775 F.3d 828, 841 (7th Cir. 2014). The child pornography guidelines, were promulgated not as the result of the Sentencing Commission usual institutional role of making decisions based on data and experience. *Henderson*, 649 F.3d 955 at 962-963. Instead, they are the result of Congressional fiat. *Id.* As the District Court in *Price* noted, "both guidelines call for enhancements that apply in nearly every case, exerting virtually automatic upward

pressure on sentences and failing to separate less dangerous offenders from those who are more dangerous." *Price*, 775 F.3d at 841.

Here, the guidelines are accurately run and call for life incarceration for Jesus. PSR ¶ 108. Notably, these guidelines are likely higher than they would be had Jesus actually raped a child. *See United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D.W.V.) ("In an instance of troubling irony, an individual who, sitting alone, obtained images of sexually exploited children on his computer, could receive a higher sentence than the Guidelines would recommend for an offender who actually rapes a child"); *See* U.S.S.G. § 2A3.1, 2A3.2.

Notably, here, note with respect to the guidelines in the present case, Jesus receives a +2 enhancement for, basically, using a computer in the offense. U.S.S.G. § 2G2.1(b)(6)(B); (PSR at 9-11). Again, this is an accurate application of the guidelines. However, the purpose of specific offense characteristics is to differentiate between more – or less – severe conduct when evaluating the offense score in each case. Since the inclusion of USSG § 2G2.1(b)(6)(B) as a specific offense characteristic, technology – and our dependence on it – has changed. Computers – for example smartphones – are so commonplace and so commonly used in these offenses that their usage no longer distinguishes offense conduct. As a result, this specific offense enhancement no longer serves a meaningful purpose in distinguishing defendants.

Finally, the Guidelines, though accurate, twice count the number of offenses against Jesus. Jesus gets +4 points on his guidelines because of the grouping provision that adds points for additional counts involving distinct victims. PSR at ¶ 73; U.S.S.G. § 3D1.4. He then gets an addition +5 for a "pattern" or repeated acts of prohibited sexual conduct. PSR at ¶ 75; USSG §4B1.5(b)(1). The conduct underlying both enhancements is essentially the same, offenses against multiple minors over a period. Though this does not count as *impermissible* double counting, the Court can still consider whether the guidelines considered *without* the application of both, duplicative enhancements is sufficient. *See United States v. Bruffy,* 2012 U.S. Dist. LEXIS 4129 at *12 (W.D. Va. 2012).

If the Court were to calculate the guidelines without the computer enhancement, which does not realistically distinguish between offenders, and without the grouping enhancement, because it duplicates the repeat sexual offender enhancement, Jesus's offense level would be 38. His guidelines range would be 235 to 293. 216 months is but a small downward variance from this guidelines range.

## V. <u>Need to avoid unwarranted sentencing disparities</u>

Three cases in this district, with similar or worse facts, received sentences lower than the *minimum* that Jesus can receive:

- *United States v. Michael Anthony Comer*, 5:24-cr-14 – Mr. Comer received a sentence of 186 months. The statement of facts references up to 26 minor victims. *Comer*, 5:24-cr-14 at 2 (ECF no. 83). At least 11 minor victims were

identified. USA Sentencing Memorandum, *Comer*, 5:24-cr-14 at 2 (ECF no. 54). One of the minor victims was only twelve years old when Mr. Comer paid her to insert a sex toy into her vagina. *Id*. Mr. Comer also engaged in blackmail and threats of distribution of his minor victims. *Id*. at 3. He threatened to kill a minor victim. *Id*. Mr. Comer was 45-years old when he engaged in this conduct. *Id*. at 5-6.

- *United States v. Alageon Jaytwon Lee Gravely*, 7:24-cr-41 – Mr. Gravely received a sentence of 168 months. Unlike Jesus, Mr. Gravely filmed himself having sex with two of the minor victims – both aged 16. Statement of Facts, *Lee Gravely*, 7:24-cr-41 at 2-3 (ECF 56). Mr. Gravely distributed one of the videos he made of himself having sex with a 16-year old. *Id*. Mr. Gravely received videos from more that *100* different minors. *Id*. at 4. Mr. Gravely's (c)(1)(C) range contained in his plea agreement spanned only 60 to 180 months. Plea Agreement, 7:24-cr-41 at 3 (ECF 54). In its sentencing memorandum, the Government provided the reason that 180 months was a sufficient but no more than necessary sentence: "Simply put, the government recognizes the defendant's age as well as the relative age differences between the defendant and most of his victims, with Minor Victim 6 being a notable exception." Government Sentencing Memorandum, *Gravely*, 7:24-cr-41 at 7. MV6 was 14 years old at the time of the offense.

- *United States v. Edward Zimmerman*, 5:23-CR-4-EKD – Mr. Zimmerman received a downward variance to a sentence of 168 months. The defendant in Zimmerman engaged in conduct of seeking sexual content from minors online similar to Jesus's here. While Zimmerman's case involved fewer victims, it differed in that the victims in Zimmerman lived close to the defendant, he had asked to meet in-person for sex several times and purchased sex toys to be used during the production of the sexual content.

A sentence higher than 216 months would create an unwarranted sentencing disparity given the above two cases.

**<u>CONCLUSION</u>**

Jesus's conduct deserves substantial imprisonment. The question is whether 216 months is enough. In making this determination, this Court should consider what incarceration will mean in reality for Jesus Diaz – day-by-day, month-by-month, year-by-year. Sex offenders are at greater risk while incarcerated.[7] Common sense dictates that prison time will be harsh on Jesus, who is lacking in criminal history and experience with

---

[7] *United States v. Rausch*, 570 F.Supp.2d 195, fn. 8 (D.Colo. 2008) ("I have no doubt that the BOP takes every reasonable step it can to insure their safety and to prevent other prisoners from gaining access to prisoners' criminal histories. Nevertheless, the plethora of prisoner cases I have presided over in the past thirty years, the volume of letters received from inmates and the legion of published studies on prison conditions establish clearly that violence against inmates, especially sex offenders, does occur and that vulnerable inmates are at greater risk of violence than typical inmate populations.")

incarceration beyond misdemeanors. He also faces losing his father, currently age 67, while incarcerated on top of already having lost his mother.

Jesus recognizes that he can never undo what he has doneand that the facts of this case are egregious. They must be punished as such. But Jesus remains fervently focused on his spiritual life in a way that gives hope for a transformation. He has begun to come to grips with his lifetime of trauma, embarrassment and isolation. He will need to recognize that he had no control over his own childhood sexual abuse and what happened to his mother. *See Janosko*, 355 Fed. Appx. at 894. H Under an individualized assessment that considers the all complex factors involved, 216 months is a just sentence, and we ask this Court to impose it.

Respectfully submitted,

s/ William Warriner
William Warriner
V.A. Bar No.: 88589
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market Street, Ste 106
Charlottesville, VA 22902
Ph. (434) 220-3388
William_Warriner@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record.

s/ William Warriner
William Warriner